UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:20-cr-181 (KAD) |
| v. | |
| DAVID DUNN | April 6, 2021 |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

In connection with the sentencing of defendant David Dunn, scheduled for April 13, 2021, the Government respectfully submits that a meaningful term of imprisonment is appropriate and represents a balanced consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a).

## BACKGROUND

David Dunn and his co-defendant Armando J. Perez were trusted to serve the City of Bridgeport and its citizens as public officials. Instead, Dunn, who was the City's Acting Personnel Director, and Perez, the Acting Chief of the Bridgeport Police Department ("BPD"), engaged in a nine-month conspiracy to deceive the City by secretly rigging the purportedly open and competitive selection process for a permanent BPD chief. More specifically, Dunn and Perez, working together, manipulated that search process by tailoring the scoring criteria to favor Perez, using BPD officers to prepare Perez's examination materials, stealing confidential examination questions, and attempting to influence an exam panelist. As a result of the scheme, the City was deceived into ranking Perez among the top three examination finalists, and ultimately awarding him a five-year contract as the permanent chief. Compounding these crimes, when Dunn became aware that the FBI was looking into his conduct, he sought to obstruct the investigation by knowingly making false statements to investigators.

**I.     Dunn's Participation in the Scheme to Corrupt the Hiring Process**

David Dunn was the City's Acting Personnel Director since 2009. In that role, Dunn was responsible for managing the City's personnel and payroll departments, and overseeing the hiring for all City jobs, including for the police chief. Presentence Report, dated February 3, 2021 ("PSR") ¶ 10.

In March 2018, the City commenced its search for a permanent police chief, with Dunn supervising the process. *Id.* Pursuant to the City's Charter, Dunn was required to conduct an "open and competitive" "examination" to determine the three highest-ranked applicants, from which the Mayor could select a permanent chief.[1] PSR ¶ 11. Moreover, Mayor Joseph Ganim's Chief of Staff stressed to Dunn that the search must be conducted professionally, fairly, and timely. Complaint ¶ 17. Consistent with the City's public statements that the search was being conducted in an open and competitive manner consistent with the Charter, in March 2018, Dunn had the City hire an outside consultant, Randi Frank, to conduct the examination process. PSR ¶ 12. Dunn had

---

[1] The City's Charter provides:

> The examination for the position of chief of police shall be open to any person possessing the minimum qualifications established for such position regardless of whether the applicant is currently or has ever been an employee of the city of Bridgeport. The examination shall be open and competitive and shall not be promotional. Whenever a vacancy arises in the position of chief of police, the personnel director shall, upon request, certify to the mayor the names of the three (3) candidates standing highest upon the employment list for such position. If no such list exists, the personnel director shall, within 150 days of the request, hold a test for such position and shall, upon the establishment of an employment list, certify to the mayor the names of the three persons standing highest thereon.

Bridgeport City Charter, Chapter 13, Sections 4(b)(2) & (3).

worked with Frank previously, including in the City's 2010 police chief search and the City's search for a Sikorsky Memorial Airport manager.

The permanent chief examination had four stages: (1) Frank's screening of resumes and cover letters; (2) a written exam, comprised of a questionnaire and two essay questions, graded by Frank; (3) a telephonic oral exam conducted by Frank; and (4) an in-person interview by five outside panelists, moderated by Frank.  *Id.*  Working together, Dunn and Perez corrupted each of these stages for Perez's benefit.  Dunn provided Perez with confidential examination materials, adjusted the examination scoring to help Perez, and tried to induce an exam panelist to favor Perez; Perez used BPD officers under his command to draft his examination materials, then used the confidential information supplied by Dunn to prepare for the oral exam and panel interview.

      A.      **Stage 1: Resume and Cover Letter**

Frank formally began the search process in May 2018 by preparing and advertising a profile for the permanent BPD chief position, which listed the minimum qualifications.  PSR ¶ 13.  Dunn instructed Frank that a bachelor's degree was not a requirement, and there should be no penalty for a candidate without one.  *Id.*  This was to Perez's advantage, since he was the only applicant for the position who did not have a bachelor's degree.  *Id.*

On May 31, 2018, Dunn forwarded to Perez (but not to other applicants) an email from Frank containing non-public information about the status of the search, asking Perez, "R u ready to mail your resume?"  PSR ¶ 15.  Perez enlisted two BPD officers under his command, Officer-1 and Officer-2, to prepare his resume and cover letter, at least in part, while on BPD time, in BPD offices, and using BPD computers.  *Id.*  On June 11, 2018, Perez emailed to Frank (and Dunn) a resume and cover letter that Officer-1 and Officer-2 had prepared.  *Id.*

Around this time, Perez began telling other BPD officers that he would be selected as the next BPD chief.  Perez told one BPD officer that Ganim had said, "You're my guy.  You have it."  Perez told another officer that Ganim had promised him the job regardless who applied.  (Later, while the examination process was ongoing, Perez told his BPD driver that the chief job was his, saying, "don't worry, I'm going to be the Chief.")

Eventually, Frank received resumes from 16 applicants, and, after consulting with Dunn, eliminated five for failing to meet the required qualifications.  PSR ¶ 17.

B.   **Stage 2: Written Exam**

On May 12, 2018, Frank emailed Dunn an update on the process, as well as drafts of the testing questionnaire, essay questions, and scoring guide for the second stage, asking him to keep the testing questionnaire "very confidential."  PSR ¶ 14.  On May 21, 2018, Frank emailed Dunn the questionnaire and essay questions that she intended to use for the second stage of the selection process, along with the associated scoring guide that set forth the points to be awarded for various types of answers on the candidates' questionnaires.[2]  *Id.*  Dunn forwarded that email from his City email to his personal email, and Perez later gave Officer-1 a copy of Frank's scoring guide—circumstances strongly suggesting that Dunn gave the scoring guide to Perez for his use during the application process.

Nearly a month later, on June 18, 2018, Perez and the other ten applicants received the written exam from Frank, which consisted of a three-page questionnaire and two essay questions.  PSR ¶ 18.  Frank's email instructed Perez to complete the exam by himself: the "Written Exam/Questionnaire will be graded, so please complete yourself and please provide

---

[2] Dunn helped Frank determine how many points to award on the questionnaire, and suggested revisions that benefited Perez.  For example, as discussed below, Dunn asked Frank to increase the points for experience beyond 20 years.

accurate/truthful information. . . ." *Id.* The instructions on the written exam were similar: "This questionnaire represents a testing process . . . and as such you are to complete it yourself. Similar to an application you need to be truthful; discovery of inaccuracies will be cause for rejection/disqualification." *Id.* In violation of those clear and plain instructions, Perez again enlisted Officer-1 and Officer-2 to help complete his written exam on BPD time. PSR ¶ 20.

On June 25, 2018, Perez emailed Frank and Dunn (among others) his completed written examination. PSR ¶ 21. Frank responded by email to Perez that it was not appropriate for Dunn to have a copy, since they would "be graded by me [Frank]," and that no other candidate was sending their materials to Dunn. *Id.* Perez forwarded Frank's email to Dunn, writing, "David, you are the Civil Service Director no one ever told me that you are [not] entitled to see my essay, I am confuse [sic]." *Id.* Later that day, Frank informed Perez that "David [Dunn] has said he has not reviewed so everything is ok." *Id.*

In grading the applicants' examinations, Dunn requested multiple changes to the scoring process that worked to Perez's benefit. PSR ¶ 19. Dunn had Frank add points for applicants with more than 20 years of law enforcement experience (which Perez had), not award extra points to applicants who were Bridgeport residents (which Perez was not), and not penalize applicants without a Bachelor's degree (which only Perez did not have). *Id.* After discussions with Dunn, Frank also agreed to award extra points to Perez for his service as acting police chief. *Id.* Using this scoring process, Frank eliminated three more applicants, leaving eight, including Perez.

C.   **Stage 3: Telephone Exam**

On July 17, 2018, Frank emailed Perez to let him know that he had passed the written exam, and would now move on to the third examination stage, an approximately hour-long telephone "oral exam" with Frank. PSR ¶ 22.

That same day, Frank sent Dunn an email, in which she wrote, "[a]ttached is the status report of the search to date as requested. I also put together the oral interview questions that I plan to use - please approve by July 30th so I can start the interview on July 31st." *Id.* The second document consisted of 12 draft oral exam questions and Frank's scoring guide, both of which she ultimately used to conduct the applicants' telephone exams.

On July 18, 2018, Dunn forwarded Frank's email and its attachments to Perez (and to no other applicants), instructing, "Call me please."[3] *Id.* On July 20, 2018, Perez requested Officer-1 discretely print the oral interview questions, telling Officer-1, "make sure no one sees it because we are the only ones who have it." Perez then requested that Officer-1 use these misappropriated exam questions and scoring guide to draft written answers that Perez could use in his telephone interview. PSR ¶ 23.

Officer-1 did not complete this task before Perez put him on administrative leave on July 26, 2018. *Id.* Over the next few days, Perez repeatedly requested Officer-1's help using the exam questions to prepare for the oral exam, including multiple requests that Officer-1 sneak into BPD headquarters to retrieve the draft answers. Complaint ¶¶ 54-58.

Perez's telephone oral exam took place on August 9, 2018, during which Frank used nine of the twelve questions that Dunn had provided to Perez. PSR ¶ 24. Although Frank determined that all eight remaining applicants scored fairly evenly on the oral exam, one more was eliminated by Frank and Dunn after a background search, leaving seven, including Perez. *Id.*

For a period of weeks, the examination process stalled, during which media scrutiny of the search for a permanent BPD chief increased. On September 10, 2018, the Connecticut Post

---

[3] The next call between Perez and Dunn seems to have occurred on July 22, 2018, and lasted approximately two minutes.

published an article critical of the secrecy surrounding the hiring process. *See* Brian Lockhart, "City Won't Reveal Chief-Search Panel," CT Post (Sept. 10, 2018), https://www.ctpost.com/local/article/City-won-t-reveal-chief-search-panel-13215328.php. Perez was quoted as confirming that he was "a candidate," but falsely stated, "That's all I know. . . . I've stayed away from [seeking details about the search process] just to make sure it was objective . . . I don't want anybody to say 'A.J. influenced'" the process. PSR ¶ 25. In response to this article, Dunn circulated an email to the Mayor's office with bullet points for a proposed statement outlining the examination process and detailing how it supposedly complied with the City Charter. *Id.* Although by this time Dunn had already given Perez (and no other candidate) the confidential oral exam questions and Frank's scoring guide, Dunn suggested that the City's response should emphasize the "Confidentiality of test questions/candidates/examiners," writing, "[t]he exam for Police Chief is a competitive selection process for an executive level employment position and at a minimum, while ongoing, the process should be confidential to ensure integrity and fairness of the process." *Id.* Dunn's input was ultimately incorporated, in part, in an "op-ed" the Mayor eventually published defending the integrity of the City's examination process. *Id.*

        **D.**        **Stage 4: Panel Interview**

As one of the seven remaining applicants, Perez was invited to participate in the final examination stage, the panel interview.

On October 9, 2018, Frank emailed Dunn a document ("Bridgeport Police Chief Questions") consisting of 42 suggested questions for interview panelists to ask applicants, 15 of which were highlighted. PSR ¶ 26. Two days later, on October 11, 2018, Dunn forwarded Frank's email to himself at his personal email account (just as he had with the May 2018 scoring guide).

*Id.* As with questions for the prior interview, Dunn likewise provided a copy of these potential panel interview questions to Perez. Perez Def. Mem. at 16.

On October 17, 2018, Dunn called a panelist ("Panelist-1"), and told her that the Mayor "would like to see Perez in the top three." PSR ¶ 28. Panelist-1, who had known Dunn for more than 20 years, understood Dunn wanted her to score Perez higher, or influence the other panelists to do so, to please Mayor Ganim. *Id.*

On October 19, 2018, Perez and the applicants had their panel interviews. PSR ¶ 27. In advance, Frank provided the panelists each applicant's cover letter, résumé, and written exam essays (which, as discussed previously, Perez had instructed Officer-1 and Officer-2 to prepare for him) and her notes from each applicant's telephone exam (the questions for which Dunn had provided to Perez in advance). *Id.* Frank moderated each applicant's panel interview using several of the highlighted questions from her October 9 email (which Dunn had forwarded to his personal email, and Dunn had shared with Perez).

Perez was ranked second following the panel interviews, and Dunn certified to the Mayor that Perez was one of the three finalists. PSR ¶ 29. The City issued a press release announcing the top three candidates, in which Dunn was quoted, "I am pleased with the nationwide search and selection process for police chief. We saw as many as seventeen valid applicants from across the country and *have taken great measures to ensure a fair and competitive process*. Bridgeport will be served well." (Emphasis added). PSR ¶ 30.

*   *   *

On November 5, 2018, Ganim announced that he had selected Perez to be the permanent chief, and awarded him a five-year contract paying $145,428 annually. PSR ¶ 31. According to a press article, after his swearing in ceremony, Perez untruthfully bragged, "I did this on my own."

*See* Brian Lockhart, "Ganim Makes Perez Bridgeport's Permanent Cop Chief," CT Post (Nov. 5, 2018), https://www.ctpost.com/local/article/Ganim-makes-Perez-Bridgeport-s-permanent-cop-13364763.php.

Although Perez's salary did not change significantly when he moved from acting chief to chief, under the terms of his contract, he was able to cash out his leave time, worth more than $400,000 (broken into pre-tax payments of approximately $171,000 in January 2019, $127,000 in August 2019, and $127,000 in July 2020). PSR ¶ 31. Additionally, that contract guaranteed Perez at least five years as chief—through Ganim's current term—that could be renewed for an additional five-year term. Thus, had the fraud not been discovered, Perez could have been the BPD chief until 2028.

## II.   Dunn's Obstructive Conduct

In an attempt to avoid detection and obstruct the Government's investigation, Dunn made false statements to law enforcement. PSR ¶ 33. In particular, on February 13, 2020, Dunn was interviewed at the U.S. Attorney's Office, subject to a proffer agreement. PSR ¶ 37. Although accompanied by counsel, warned about making false statements, and given an opportunity to amend or correct anything he had said, Dunn made a number of false and misleading statements in an effort to conceal his conduct. PSR ¶ 38. In particular, Dunn repeatedly falsely denied telling a panelist that the Mayor wanted Perez to be ranked in the top three. *Id.* Specifically, Dunn falsely stated:

- "I had no conversations with the panel advocating for AJ [Perez]. I remember I didn't have these conversations."

- Asked whether he had conveyed to any panel member that the Mayor or his administration wanted Perez in the top three, Dunn answered, "I never did that."

- Asked whether he called Panelist-1 in October 2018, prior to the panel interviews, to tell Panelist-1 that the Mayor wanted Perez to be ranked in the top three, Dunn responded, "I didn't call [Panelist-1] on my own to tell [Panelist-1] the Mayor wanted AJ [Perez] in the top three," then reiterated that he "never spoke about the Mayor or administration wanting AJ in the top three."

PSR ¶ 38.

### III. The Charges, Dunn's Guilty Plea, and Plea Agreement

On September 9, 2020, Dunn was charged in a 25-page complaint (3:20-mj-776-WIG, Dkt. #1), with conspiracy to commit wire fraud, wire fraud, and one count of false statements.

On October 5, 2020, Dunn waived indictment and pled guilty pursuant to a plea agreement to a two-count Information charging conspiracy to commit wire fraud in violation of 18 U.S.C. § 371 and making false statements in violation of 18 U.S.C. § 1001(a)(2). PSR ¶ 1. Dunn admitted in the plea agreement to all of the conduct alleged in the complaint.

As part of that plea agreement, Dunn agreed to pay $149,407 in restitution to the City (jointly and severally with Perez), which amount was the City's direct loss as a result of the fraud. Subsequently, the City requested additional compensation for legal fees and the costs of its own investigation, and recently agreed with Dunn (and Perez) on a total restitution amount of $299,407.

### DISCUSSION

In this case, a meaningful term of imprisonment is appropriate and would meet the objectives set forth in 18 U.S.C. § 3553(a), given (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (B) to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(1), (2)(A)-(B).

I.      **The Sentencing Guidelines**

As the Court is aware, district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 49 (2007). Here, consistent with the Probation Department's calculations, the parties agree that the applicable advisory Guidelines range is 18-24 months' imprisonment and the applicable fine range is $7,500 to $75,000. PSR ¶¶ 110, 120.

II.     **The Statutory Sentencing Factors**

After determining the Guidelines range, the Court must weigh the sentencing factors under 18 U.S.C. § 3553(a).

A.      **The Nature and Seriousness of the Offense**

Dunn's conduct was unquestionably serious. Dunn showed blatant disregard for his responsibilities as Bridgeport's Acting Personnel Director as he participated in a scheme to defraud the City of Bridgeport, which was executed over a period of months, involved numerous steps, and affected every stage of the examination process. Aside from the significant financial damage to the City, Dunn's conduct undermined trust in the Bridgeport Police Department and the City's government. Dunn and his co-defendant took from its citizens their expectation that the City would be run in their best interests, and not for the benefit of certain influential individuals. By cynically undermining the chief selection process, Dunn's scheme also deprived honest candidates of a legitimate chance to lead the City's police department.

Although Dunn did not directly profit from the scheme, he engaged in the scheme in order to maintain the favor of the current administration and his position of authority as the City's acting personnel director. Indeed, the scheme was substantially driven by Dunn, insofar as it was Dunn who manipulated the exam scoring to favor Perez, who provided the exam questions to Perez, and

who attempted to pressure a panelist to rate Perez as one of the top three candidates. That Dunn—the Personnel Director vested with the responsibility to oversee a meritocratic hiring processes—would without pause cast aside his duty to the City and its citizens in an effort to maintain his own position demonstrates a significant breach of public trust.

While Dunn's abuse of his role alone demands a meaningful term of imprisonment, his efforts to conceal his conduct when he became aware of the criminal investigation are particularly deserving of punishment. As detailed above, when faced with the real possibility of criminal liability, Dunn's response was to lie about his conduct and the pressure he had put on an exam panelist to rate Perez as one of the top three candidates. Dunn's decision to lie was not a momentary blunder after being initially approached by law enforcement about his crime, but occurred in the context of a meeting with the U.S. Attorney's Office for which he was fully prepared and assisted by counsel, and despite the benefit of counsel and multiple warnings of the danger of making false statements. In short, taken together with his scheme to defraud the City, Dunn's false statements to federal investigators merit more than the token punishment of probation that he seeks.

Although Dunn acknowledges his offense was "serious," he does not directly address the wide-ranging impact of his crimes in his submission. Instead, Dunn highlights the fact that he has lost his job as a result of his conduct and has suffered financially. Def. Mem. at 2-3. That Dunn lost his job and is suffering financial consequences after committing a federal crime against his former employer is unremarkable, and therefore cannot support his suggested non-incarceratory sentence.

A meaningful term of imprisonment is an appropriate response to Dunn's serious criminal conduct.

### B.     Deterrence

By imposing a meaningful term of imprisonment, the Court would send a clear message that corruption at the highest echelons of City government is not only morally wrong, but carries significant personal consequences.  Dunn and his co-defendant's corruption—and the history of similar cases in Bridgeport—show that such a message is necessary.  If the justice system is to have an impact on public corruption in the City and help restore faith in good governance, then the sentences it imposes must consistently demonstrate that criminal conduct by public officials is not acceptable.  The non-incarceratory sentence sought by Dunn would substantially diminish this deterrent message.

Additionally, Dunn's scheme was difficult to uncover and it will be even more difficult to correct the full damage that it caused, particularly to the trust the citizens of Bridgeport have in their local government.  When such an intricate and damaging scheme is uncovered, a substantial sentence is warranted.  *See, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

The defendant claims, in sum and substance, that the mere fact that he was prosecuted, required to pay restitution, and lost his job are adequate deterrence.  Def. Mem. at 3.  While those

consequences likely will specifically deter Dunn from committing further crimes, they are not sufficient for purposes of general deterrence. Indeed, the collateral consequences the defendant cites are no different than those typically associated with defendants' federal crimes, and yet Dunn himself was not deterred. Something more than just a felony record and financial pain is required to adequately deter others after Dunn.

A meaningful term of imprisonment would send such a deterrent message to others tempted to follow Dunn's example.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a meaningful term of imprisonment, a sentence that is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

AUDREY STRAUSS
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF NEW YORK

_____/s/_____
ELI J. MARK
JEFFREY C. COFFMAN
SPECIAL ATTORNEYS ACTING UNDER
AUTHORITY CONFERRED BY 28 U.S.C. § 515

JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT
Fed Bar No. phv05083
jonathan.francis@usdoj.gov
157 Church Street, 25th Floor
New Haven, CT 06510
(203) 821-3700
jonathan.francis@usdoj.gov

- 15 -

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

                                                  /s/
                                    JONATHAN N. FRANCIS
                                    ASSISTANT UNITED STATES ATTORNEY